IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO.: 4:17CR00866-RBH |
| | ) | |
| BRANDON MICHAEL COUNCIL | ) | |

**<u>BRANDON COUNCIL'S MOTION TO STRIKE THE DEATH PENALTY BECAUSE IT IS APPLIED UNCONSTITUTIONALLY AND DISPROPORTIONATELY TO THOSE CHARGED WITH THE MURDER OF WHITE, FEMALE VICTIMS</u>**

Since the beginning of this case, Brandon Council has offered to plead guilty to every single count in the indictment, waive all his appellate and post-conviction rights, and accept a sentence which ensures that he will never be released from prison for the rest of his life, for any reason. That offer still stands. Nevertheless, the government continues to seek the death penalty. For that reason, examination of the law and how it is applied must meet Constitutional scrutiny. Here, it does not. Mr. Council is a black male charged with the killing of two, white women. In reviewing death penalty cases, it is clear that the Federal Death Penalty Act is unconstitutional because it is applied disproportionately to those accused of killing white, female victims. Accordingly, this Court must strike the death penalty in this case due to racial discrimination and disproportionality pursuant to 18 U.S.C. §3593(f) and 18 U.S.C. §3595(c)(2)(A) and the Fifth, Sixth, and Eighth Amendments to the United States Constitution.

But if the government wants to proceed to a capital trial, the Court must closely examine the FDPA and how it is applied.

### A. **Brandon Council is an African-American charged with the murder of two, white women. The combination of a black defendant and white victims has resulted in grossly disproportionate death sentences.**

Brandon Council is an African-American male. The two victims in this case, Mrs. Kathryn (Katie) Davis Skeen and Mrs. Donna Major, are Caucasian women. This case presents a clear danger that the race of the defendant and/or the race of the victim influenced the decision to seek the death penalty or will influence the jury's ultimate decision. "Since 2000, in a grossly disproportionate number of cases, juries have imposed the death penalty when the victim was a white female." *See* Exhibit 1 ¶ 10 (June 17, 2016, Declaration of Kevin McNally).

As referenced in Declaration of Kevin McNally, Lauren Cohen Bell, Ph.D., an expert who has studied the federal death penalty "concludes that federal capital defendants accused of the murder of white female are more than twice as likely than other federal capital defendants to be sentenced to death." *Id.* at 12. "Defendants who killed white female victims are overrepresented among federal death sentenced defendants," and that there is "essentially zero" chance that the race and gender of the victim is not related to the capital sentencing outcome. *Id.* at 49 (Declaration of Lauren Cohen Bell, Ph.D., ¶¶ 11, 13). The numbers make it clear that the cases where the victim is black does not result in comparable death sentences. *See id.*; *see also* John Paul Stevens, *On the Death Sentence, The New York Review of Books review of David Garland's* Peculiar Institution: America's Death Penalty in an Age of Abolition,

Harvard University Press, Cambridge, 2010 (Dec. 23, 2010) ("That the murder of black victims is treated as less culpable than the murder of white victims provides a haunting reminder of once-prevalent Southern lynchings.").

Racial disparities and tensions permeate the criminal justice system generally, but has grave and even more significance in the death penalty context. *See* Staff Of Sub-Comm. On Civil & Constitutional Rights of The H. Comm. On The Judiciary, 103d Cong., Racial Disparities In Federal Death Penalty Prosecutions 1988-94, reprinted in 140 Cong. Rec. S9588, 9588 (May 6, 1994) ("Race continues to plague the application of the death penalty in the United States. . . . On the federal level, cases selected have almost exclusively involved minority defendants."). Similarly, Supreme Court Justices Breyer and Ginsberg observed that race continues to play a role in the operation of the death penalty:

> Numerous studies, for example, have concluded that individuals accused of murdering white victims, as opposed to black or other minority victims, are more likely to receive the death penalty. . . . Fewer, but still many, studies have found that the gender of the defendant or the gender of the victim makes a not-otherwise-warranted difference.

*Glossip v. Gross*, 135 S. Ct. 2726, 2760-2761 (2015) (Breyer J., Ginsberg, J., dissenting) (questioning the constitutionality of capital punishment).

The former President of the United States Barack Obama also stated:

> [W]e know statistically that there is a racial bias that has been built into the death penalty . . . I've asked the Department of Justice [in addressing how to make the criminal justice system more fair] . . . to include examination of the death penalty.

The Marshall Project, Interview of President Obama, October 23, 2015. Available online at https://www.themarshallproject.org/2015/10/23/watch-obama-discuss-

death-penalty-racial-profiling-with-the-marshall-project (last accessed September 18, 2018). Professor Rory Little, writing from the perspective of having served on Attorney General Reno's Capital Case Review Committee, noted that serious questions about regional and racial disparities had not been ameliorated by the administrative process within the Justice Department. R.K. Little, 26 Fordham Urban L.J., 347, 450-90 (1999). With the existence of these disparities and constitutional concerns, litigation and a hearing before this Court is appropriate.

**B. The Federal Death Penalty is unevenly applied and suffers from intractable problems of racial discrimination in the targeting of minority defendants and a demonstrated race/gender-of-victim effect.**

From the earliest days of the government's efforts to enforce a nation-wide death penalty, patterns of uneven and apparently discriminatory application appeared. From the very outset, the federal death penalty was utilized almost exclusively by federal prosecutors in the South and, not surprisingly, federal death verdicts were returned almost exclusively in those traditional "death-belt" jurisdictions. Added to this arbitrary factor was the invidious circumstance of race, since the federal death penalty, as it was rolled out in the 1990's, targeted a disproportionately large number of minority groups, particularly African-Americans and Hispanics. Mr. Council is African-American. The victims in this case are two white females.

Despite the efforts of the Department of Justice to eliminate racial and geographic influence in the administration of capital punishment, these disparities are longstanding. In 2001, then Assistant Attorney General Holder examined the

federal death penalty's racial demographics and expressed concern over the racial and ethnic disparities in its application. *See* Marc Lacey & Raymond Bonner, Reno Troubled by Death Penalty Statistics, N.Y. TIMES, Sept. 12, 2000, at A17 (cited in Racial Geography of the Federal Death Penalty). The numbers continue to reflect the same disparities that caused such concern ten years ago. Not only are African-Americans and minorities over-represented in the category of defendants authorized for federal capital prosecution, but African-Americans are over-represented in the category of defendants receiving the federal death penalty. *See* Exhibit 1 (Exhibit A attached to June 17, 2016, Declaration of Kevin McNally). Two of the three defendants executed under the federal death penalty were people of color. *See* Death Penalty Information Center, List of Prisoners, Federal Death Row Prisoners, http://www.deathpenaltyinfo.org/federal-death-row-prisoners (last visited September 13, 2018). Timothy McVeigh, who killed 168 people and injured over 680 others, is the only white person to have been executed under the federal death penalty in the modern era. *Id*.

   C. **The race and gender of the victim, particularly white female victims, continue to play a strong role in the application of the federal death penalty.**

An assessment of federal capital cases completed on June 11, 2016, indicate 503 authorized cases, 74% are minority defendants (251 (50%) of whom are African-American, 93 (18%) of whom are Latino, 24 who are "other" minorities (5%)) and only 27% (135) white. *See* Exhibit 1 ¶ 9 (June 17, 2016, Declaration of Kevin McNally). The most salient feature of the federal death penalty is that it is used most frequently for inter-racial offenses where the defendant is black and the victim white. In terms

of the Attorney General's decision to seek the death penalty, the odds of facing a capital prosecution where the victim is white are significantly higher. *See* McNally, *Race and the Federal Death Penalty: A Nonexistent Problem Gets Worse*, 53 DePaul L. Rev. 1615 (2004) (documenting the white-victim effect through analysis of federal capital prosecutions under Attorneys General Reno and Ashcroft through January 26, 2004).

### D. The death penalty has largely not been sought for the murder of minority victims during bank or armored vehicle robberies, and its application here suffers from intractable problems of racial discrimination in the targeting of minority defendants and a demonstrated race/gender-of-victim effect.

The death penalty has generally not been sought where the victims are minorities. For instance, in *United States v. Hill et. al*, S.D. TX, 17-CR-00007, the four defendants, called a "robbery crew" committed a series of robberies and at least two deadly robberies of armored trucks in the Houston, Texas area. The two male victims were Hispanic and an African-American. Consistent with other cases, the government did not seek the death penalty. It is clear that the government have not sought the death penalty against most defendants who killed during bank or armored vehicle robberies. Similarly, in the robbery-murder of 26-year-old armored truck guard Alvaro Lopez-Ramos, in which $345,000 in cash was stolen, the government did not seek the death penalty. *See United States v. Mitchell et. al*, S.D. FL. 11-CR-20613-JLK.

Examples are easily multiplied: *United States v. Booker et al.*, N.D. GA. 11-CR-255 (victim was a Hispanic female and the government did not seek the death

penalty); *United States v. Moss*, S.D. FL. 10-CR-60264-JIC (victim was a Hispanic male and the government did not seek the death penalty); *United States v. Jackson*, D. NM. 10-CR-1374-MCA (victims were Hispanic and white female, and the government did not seek the death penalty); *United States v. Marshall*, N.D. IL 07-CR-0351 (victim was a black male bank teller and the government did not seek the death penalty). *See also* Exhibit 2 (chart listing closed federal capital eligible cases involving bank robbery or armored vehicle robbery through June 11, 2018).

Similarly, white, racist prison killers and mass murderers have not even been sentenced to death. Welborn, "Aryan Brotherhood Convicts Get Life Sentences," The Orange County Register (September 16, 2006). Similarly, a drug lord who was convicted of multiple murders did not get the death penalty. Rashbaum, "Jury Votes Against Execution in Trial of Drug Dealer Convicted in Two Killings," New York Times (February 10, 2007). Similarly, a drug kingpin with a criminal record, who ordered the murder of a witness' *innocent* father, was not sentenced to death. *See United States v. Solomon* (W.D. Pa. No. 2:05-CR-00385-TFM). *Jury spares life of dealer who ordered hit*, Pittsburgh Post-Gazette, November 5, 2007. In Arkansas, Vertis Clay was sentenced to life for the gruesome murder for hire during a drug-related robbery. *See United States v. Clay*, E.D. Ar 4:04-CR-00035-WRW. Inmate Rudy Sablan was sentenced to life without parole for killing and mutilating a fellow inmate. His cousin received the same sentence. The victim was stabbed to death and his organs removed. Fong, "Sablan Sentenced in Prison Murder," Rocky Mountain News (June 21, 2008).

### E. <u>The discriminatory impact of the FDPA render it unconstitutional.</u>

In *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), the Court insisted "that capital punishment be imposed fairly, and with reasonable consistency, or not at all." If the Federal Death Penalty Act [FDPA] were written to limit the use of the federal death penalty only to cases where whites were murdered, the statute would be patently and facially unconstitutional. Alternatively, if the FDPA were written to require that, in deciding whether to seek the death penalty, greater weight should be accorded to seeking the death penalty where the victim was white, once again the unconstitutionality of the statue would be obvious. Or, if jurors were told that it was permissible to consider the murder of white people as more serious than the murder of non-whites, once again the unconstitutionality of the statute would be plain.

In reality, the FDPA operates with a demonstrable "white-victim effect," that is, a defendant's chances of being authorized for a capital prosecution and then actually sentenced to death increase significantly where the victim is white. This practice, effect, and impact is reprehensible to the Constitution.

Based on this "white-victim effect," this Court should declare the FDPA unconstitutional because it violates the Equal Protection Clause of the Constitution and is arbitrary. Accordingly, this Court should bar the death penalty as a possible punishment in this case, accept Mr. Council's guilty plea, and impose a sentence that will guarantee his death in prison without a marathon trial and years of litigation thereafter.

**F. <u>In the event does not find strike the death penalty in this case, discovery and an evidentiary hearing regarding the issue of discrimination is requested to better submit the issue(s) to the Court.</u>**

In *United States v. Bass*, 536 U.S. 862 (2002), the Supreme Court rejected discovery related to the issue of race and the Attorney General's selection of federal capital defendants, but it did so in a situation where the defendant was accused of the murder of a black person. This case is clearly distinguishable. First, it involves white victims. Second, the defense here can, has, and does "submit relevant evidence that similarly situated persons were treated differently…" *Id*. Therefore, the defense should be "entitled to discovery." *Id*. The Court should order the prosecution to produce discovery regarding the decisions by the Attorney General to seek or not seek the death penalty. This is important so that, at the hearing, the defense may present evidence in mitigation of the prosecution's decisions to seek or not seek the death penalty, and jury decisions to impose or not impose death sentences. This evidence is otherwise admissible but particularly is so under 18 U.S.C § 3593(f), entitled "Special precaution to ensure against discrimination."

In several cases, district courts have granted motions for discovery on the issue at stake here: the possibility of racial discrimination in federal capital charging. In *United States v. Bradley*, 880 F. Supp. 271, 281 (M.D. Pa. 1994), the court issued a discovery order, admonished the parties to cooperate in expediting and simplifying the process, and stated that it would consider the government's privilege claims *in camera*, stating:

> [T]he court will allow the defense a short amount of time to obtain the discovery it seeks, and admonishes both sides to be as cooperative as possible so as to ensure that discovery is timely completed. ... The government contends that the material sought by Defendant is protected by the deliberative process privilege. ... At this stage, the court is unable to determine whether the information sought by Defendant would fall within either the deliberative process or work-product categories. However, once the defense sets forth precisely what information it seeks, the court will permit the government to reassert these privileges. The court might then order an in camera review of the documents to determine if they truly fall within the parameters of these two doctrines.

880 F. Supp. 271, 281.

Likewise, in *United States v. Llera-Plaza*, 181 F.Supp.2d 414 (E.D. Pa. 2002), the district court ordered, and the prosecution provided, discovery of documents pertaining to other capital-eligible federal prosecutions in the Eastern District of Pennsylvania. After two motions for reconsideration and partial production of the requested documents, the district court ordered the government "to produce for the court, under seal for its in camera inspection, certain of the materials" covered by the earlier order, 181 F. Supp.2d at 418. In *United States v. Glover*, 43 F.Supp.2d 1217, 1234-35 (D. Kan. 1999), the district court issued a similar order. The evidence at the hearing will established that imposition of a death sentence in this case is like being struck by lightning.

## CONCLUSION

A sentence of death in this case would be disproportionate to life sentences imposed in similar and aggravated cases. This Court should declare the FDPA unconstitutional and order that this case proceed as a non-capital case. Upon such ruling, Mr. Council will immediately plead guilty to all the charges and accept a

punishment of life without the possibility of release after the Court has heard from the victims' family members who might wish to speak.

Respectfully submitted,

**/s/ DUANE K. BRYANT**
1207 Brentwood Street
High Point, NC 27260
Phone: (336) 887-4804

**/s/ AKIN ADEPOJU**
Assistant Federal Public Defender
800 King Street, Suite 200
Wilmington, DE 19801
Phone: (302) 573-6010

**/s/ MICHAEL A. MEETZE**
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Suite # 105
Florence, South Carolina 29501
Phone: (843) 662-1510
Attorney ID#: 6662

**/s/ WILLIAM F. NETTLES, IV**
Assistant Federal Public Defender
c/o McMillan Federal Building
401 W. Evans Street, Suite # 105
Florence, South Carolina 29501
Phone: (843) 662-1510
Attorney ID#: 5935